[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11234
Non-Argument Calendar

_____

D.C. Docket No. 8:15-cv-01882-JDW-MAP


ANDREA BULEY,

                                        Plaintiff - Appellant,


                        versus


COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant - Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 2, 2018)


Before WILLIAM PRYOR, JILL PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Andrea Buley appeals the district court's order affirming the Commissioner of the Social Security Administration's decision to deny her application for supplemental security income benefits.  On appeal Buley argues that the administrative law judge ("ALJ") erred in assessing her residual functional capacity.  After careful consideration, we affirm the district court's judgment in favor of the Commissioner.

## I.    FACTUAL BACKGROUND

In January 2014, Buley applied for benefits on the basis that she was unable to work due to back pain, dizziness, vision problems, and migraines.  After her application was denied, Buley requested and received a hearing before an ALJ.

## A.    The ALJ Hearing

At the hearing, the ALJ heard testimony from Buley and reviewed her medical records.[1]  Buley described the limitations she experienced as a result of her back pain, dizziness, vision problems, and migraines.  She testified that she owned and continued to operate a tattoo establishment after filing for disability benefits.  Due to her limitations, she was able to work only about five hours a day.

Buley described how her vision problems made it difficult to work.  Although she wore reading glasses while tattooing, she had problems tattooing smaller designs and seeing contrast between ink and skin.  Her vision problems

---

[1] The ALJ also heard testimony from a vocational expert.  This testimony is irrelevant to this appeal.

2

also made her sensitive to light.  Buley explained that she suffered from daily headaches that contributed to her vision problems.  When she had a headache, her vision would become blurry, and she sometimes was unable to apply tattoos.   But when she took her headache medication, the headache would last only about 15 minutes.  Buley also testified that she experienced dizziness when the weather was bad or when she had to focus and that the dizziness made her feel like she had to vomit.

Buley also described how her neck and back pain affected her ability to work.  She described experiencing constant back pain that radiated down her right leg, along with constant neck pain.  Buley stated that she was unable to stand for long periods due to the pain.  She had previously been prescribed gabapentin but stopped taking the medication because it gave her a rash.  The ALJ asked Buley whether she was in pain at the hearing, and she answered that she was not in much pain that day because she had taken medication, including gabapentin.

In addition to Buley's testimony, the ALJ also considered statements that Buley had previously given about her physical condition.  In a pain questionnaire, Buley reported experiencing pain in her head, neck, and joints.  She described her pain level as 9/10 or 10/10 all the time and stated that medication did not relieve her pain and made her nauseous.  She also stated that she experienced migraines, which lasted for at least four days.

3

The ALJ also reviewed medical evidence regarding Buley's physical impairments. The medical evidence included records from several providers who treated Buley.

Kim Powers treated Buley after she was in an automobile accident in 2005. His medical records thus relate to a time period several years before Buley filed for disability. Powers diagnosed Buley with posttraumatic myofascial pain syndrome of the cervical, thoracic, and lumbrosacral spine and noted that she experienced recurrent dizziness and headaches. After Buley completed treatment, Powers recommended that she avoid lifting more than five to ten pounds and excessive bending, twisting, turning, or stooping. He also advised her to be cautious during dizzy spells.

Hoa Le treated Buley for her headaches and neck and back pain in 2014, around the time that Buley applied for disability benefits. During this period, Le saw Buley approximately once a month. Buley reported experiencing back and neck pain and headaches. Le's treatment notes reflect that at multiple appointments Buley denied experiencing painful joints, nausea, dizziness, or blurred vision. Le prescribed Fioricet to treat Buley's migraines and hydrocodone, an opioid, to treat her back pain. Buley reported no side effects from either medication.

4

Le's notes from the appointments during this period contain contradictory findings about Buley's neck and lumbar spine.  At each appointment, Le noted that that Buley's neck was supple with a full range of motion and also that her neck was tender with spasms and decreased range of motion.   Le noted at one appointment that Buley's lumbar spine showed no tenderness, spasms, or decreased range of motion and also that it did show tenderness, spasms, and a decreased range of motion.  There is nothing in Le's notes explaining these contradictory findings.

The medical evidence also included a March 2014 letter from Mitchell Petit, an optometrist who treated Buley.  Petit explained that Buley had undergone several vision surgeries and would soon be having another surgery on her left eye to improve her near vision.  Petit noted that Buley's vision would be affected only while she healed from surgery.

Deborah Kim treated Buley for a skin lesion on her nose in 2014. Kim's notes reflect that Buley had a supple neck; a normal musculoskeletal system; and normal balance, gait, and stance.  Kim also noted that Buley denied experiencing headaches, eye symptoms, or dizziness.

In September 2014, Kim wrote a letter assessing Buley's physical limitations.  Kim reported that Buley experienced persistent neck and back pain due to her herniated discs, as well as persistent headaches.  Kim advised that Buley

5

should not bend her neck for long periods of time or keep her neck still for more than 20 minutes.  Kim also recommended that Buley lift no more than ten pounds; avoid stooping, bending, or twisting; and use a cane to walk.  Kim noted that Buley had not received additional medical care because she was not working and had no health insurance.  As a result, Kim was unable to get an updated MRI of Buley's neck and back[2] or refer her to a dermatologist.

Oswald Williams treated Buley on a routine basis.  Buley complained to Williams that she felt nauseous, faint, and weak with joint pain, muscle ache, and neck pain.  Williams noted that Buley's neck was normal.

The ALJ also reviewed records from two providers who examined, but did not treat, Buley.  These providers were Robert Shefsky, a physician, and Martin Rosenblum, an ophthalmologist.

Shefksy examined Buley in April 2014; his examination concerned her neck and back pain and her vision problems.  Regarding Buley's neck and back, Shefsky's findings were generally unremarkable.  He noted that Buley reported experiencing neck and back pain that radiated down her arms and legs.  But Shefsky's examination showed that she had a normal range of motion throughout her musculoskeletal system, full grip strength bilaterally, and intact hand and

---

[2] The medical evidence showed that Buley had an MRI of her spine in February 2013.  It is unclear from the record whether Kim reviewed this MRI taken approximately 18 months earlier.

finger dexterity.  Her neck was supple, her joints were stable and nontender, and she had experienced no muscle atrophy.  She displayed no trigger points.  Her gait was mildly antalgic but her stance was normal.  Shefsky noted that Buley was not using a cane, was able to walk on her heels and toes, and could rise from a chair without difficulty.  She also could perform a full squat and get on and off the examination table unassisted.  Shefsky reported that Buley's x-rays showed moderate degenerative osteoarthritis in her cervical spine and mild to moderate osteoarthritis in her lumbar spine.  Shefky diagnosed her with neck and back pain by history as well as fibromyalgia by history and opined that her prognosis was stable.

Shefky also examined Buley's vision.  He documented 20/25 vision in Buley's right eye, 20/70 vision in her left eye, and 20/25 vision in both eyes.  He diagnosed her with a left eye cataract and opined that her vision prognosis was stable.

Rosenblum examined Buley's vision in November 2014.  He noted that she had a corneal scar, which caused her headaches and made it difficult for her to drive or work as a tattoo artist.  Rosenblum found that her best corrected visual acuity for distance was 20/25 in the right eye and 20/80 in the left, with 20/20 in each eye for near vision.  He reported that visual field testing results were normal.  Although Buley was visually compromised, Rosenblum concluded that she was not

7

legally blind, but she was unable to perform tasks that required "good binocularity and good depth perception."  Doc. 14-14 at 32.[3]

The record also contained an opinion from State agency medical consultant Dr. Sunita Patel, who reviewed Buley's medical records but neither treated nor examined her.  Based on his review of the file, Patel opined that Buley could perform a range of light work with certain exertional and visual limitations.  The exertional limitations included that Buley could only stand or walk for about six hours a day and sit for about six hours a day.  Patel found that Buley had limited depth perception in her left eye but no limitations in near acuity, far acuity, accommodation, color vision, or field of vision.

## B.    The ALJ's Decision

After considering the evidence, the ALJ issued a written decision concluding that Buley was not disabled.  In reaching this conclusion, the ALJ applied the five-step sequential evaluation process.

At the first step, the ALJ concluded that Buley had not engaged in substantial gainful activity since the application date.  At the second step, the ALJ concluded that she had severe impairments.  At third step, the ALJ found that Buley did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.

---

[3] Citations to "Doc. #" refer to the numbered entries on the district court's docket.

8

The ALJ then assessed Buley's residual functional capacity, finding that she was able to perform light work with certain limitations. These limitations included that Buley should: have the freedom to alternate between sitting and standing positions every 30 to 60 minutes; never climb ladders, ropes, or scaffolds, though she could occasionally climb ramps and stairs and frequently balance, stop, kneel, crouch, and crawl; avoid concentrated exposure to direct sunlight, extreme cold, wetness, humidity, and excessive noise; and avoid exposure to hazardous machinery and unprotected heights. In addition, she could perform work that required no more than frequent binocular visual acuity or depth perception. In making this assessment, the ALJ stated that he had considered all of Buley's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.

In assessing residual functional capacity, the ALJ found that Buley's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. The ALJ concluded that these statements were not supported by medical records, which showed that Buley received conservative treatment and exhibited few functional deficits on actual clinical examination. They also were inconsistent with the ALJ's observations of Buley at the hearing where she showed no signs of discomfort or pain and admitted that

pain medication helped her.  The ALJ also found Buley's claims not credible because she had continued to work after the alleged onset date.[4]

The ALJ also gave little to no weight to Kim's opinions set forth in the September 2014 letter.  The ALJ found the opinions were inconsistent with the course of care administered by Kim and the other treating providers.  The ALJ also determined that Kim's opinion that Buley should use a cane was inconsistent with her appearance at the hearing where she used no cane.  The ALJ further discussed and rejected Kim's suggestion that Buley did not have extensive medical records because she made no income and thus could not afford to purchase health insurance.  Because Buley had in fact been working, the ALJ found that this discrepancy suggested Kim was relying, at least in part, on Buley's subjective complaints, instead of objective evidence.

At step four, the ALJ concluded that Buley had no past relevant work.  At step five, the ALJ concluded that there were a significant number of jobs in the national economy that Buley could perform given her age, education, and residual functional capacity.  Accordingly, the ALJ found that Buley was not disabled.[5]

---

[4] In the context of discussing how Buley had continued to work, the ALJ noted that in previous years she had sometimes paid herself a salary from the tattoo establishment, which she owned, and other times had taken a distribution as the owner of the business.  The ALJ found that it was unclear whether Buley had continued to take such distributions from the company during the period she claimed to be disabled.

[5] Buley requested that the Appeals Council review the ALJ's decision, but the Appeals Council denied her request for review.

## C.    District Court Proceedings

Buley then filed an action in federal district court, asking the court to reverse the Commissioner's decision.  The magistrate judge issued a report and recommendation that the district court affirm the Commissioner's decision and dismiss Buley's complaint.  Buley objected.  The district court overruled Buley's objection, adopted the magistrate judge's recommendation, and affirmed the Commissioner's decision.  This is Buley's appeal.

## II.    STANDARD OF REVIEW

When, as here, an ALJ denies benefits and the Appeals Council denies review, we review the ALJ's decision as the Commissioner's final decision.  *See Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).  We review the Commissioner's decision to determine whether it is supported by substantial evidence, but we review *de novo* the legal principles upon which the decision is based.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  "Even if we find that the evidence preponderates against the [Commissioner's] decision, we must affirm if the decision is supported by substantial evidence."  *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  Substantial evidence refers to "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Moore*, 405 F.3d at 1211.  Our limited review precludes us

from "deciding the facts anew, making credibility determinations, or re-weighing the evidence." *Id.*

## III.    LEGAL ANALYSIS

A disabled individual may be eligible for social security income benefits. 42 U.S.C. § 1382(a)(1)-(2).  To determine whether a claimant is "disabled," an ALJ applies a sequential evaluation process to determine whether the claimant: (1) is engaging in substantial gainful activity; (2) has a severe and medically determinable impairment or combination of impairments; (3) has an impairment or combination of impairments that satisfies the criteria of a "listing"; (4) can perform his or her past relevant work in light of his or her residual functional capacity; and (5) can adjust to other work in light of his or her residual functional capacity, age, education, and work experience.  20 C.F.R. § 416.920(a)(4).

On appeal, Buley challenges the ALJ's assessment of her residual functional capacity.  First, she contends that the ALJ erred in assessing her residual functional capacity with regard to vision because the ALJ should have given great weight to Rosenblum's opinion that she could not perform tasks that required good binocularity and depth perception.   Second, she argues that the ALJ erred in giving little to no weight to Kim's opinions regarding Buley's physical limitations. Third, she asserts that the ALJ erred in finding not credible her testimony about the

12

intensity, persistence, and limiting effects of her symptoms.  We consider these arguments in turn.

## A.    The ALJ Did Not Err in Assessing Buley's Residual Functional Capacity Regarding Her Vision.

We begin by considering Buley's argument that the ALJ erred in assessing her residual functional capacity regarding her vision.  She claims that the ALJ erred in two ways:  by failing to state what weight he assigned to Rosenblum's opinion and by failing to give great weight to Rosenblum's opinion that Buley was unable to perform tasks that required good binocularity or depth perceptions.  We discern no error.

An ALJ must evaluate every medical opinion received and assign weight to each opinion.  *See* 20 C.F.R. § 416.927(c); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  But an ALJ is not required to use particular phrases or formulations as long as a reviewing court can determine what statutory and regulatory requirements he or she applied.  *Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987).  In general, an ALJ must give the medical opinions of a treating source "substantial or considerable weight unless good cause is shown to the contrary."  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (internal quotation marks omitted).  Good cause exists when: (1) the opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the doctor's own medical records.  *Id.*

13

But an opinion from a treating source on an issue that is reserved to the Commissioner is not treated as a medical opinion. Although an ALJ will consider a treating source's opinion on the claimant's residual functional capacity, the final responsibility for deciding this issue is reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). Accordingly, a treating source's opinion on a claimant's residual functional capacity is given no special significance. *Id.* § 416.927(d)(3).

First, Buley contends that the ALJ erred by failing to state what weight he assigned to Rosenblum's opinion. We conclude that the ALJ adequately discussed this opinion. The ALJ agreed with Rosenblum's opinion that Buley was visually compromised but not legally blind. Although the ALJ never expressly stated that he gave great weight to Rosenblum's opinion, he obviously did because he agreed with its conclusion. *See Jamison*, 814 F.2d at 588-89 (recognizing that we do not "require the use of particular phrases of formulations" by an ALJ).

Second, Buley asserts that the ALJ erred because his determination that Buley remained capable of work requiring no more than "frequent" binocular visual acuity or depth perception was inconsistent with Rosenblum's opinion that she could not perform work that required "good" binocularity and depth perception. This argument rests on the premise that Rosenblum's opinion—that Buley could not perform tasks requiring good binocularity or depth perception—

14

meant that she lacked the capacity to perform jobs that required frequent binocular visual acuity or depth perception. But we need not decide whether the ALJ's residual functional capacity assessment was consistent with Rosenblum's opinion because the Commissioner was not required to give any special significance to Rosenblum's assessment of Buley's residual functional capacity; instead, under the relevant regulations, that determination is reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2)-(3).

Once we set aside Rosenblum's assessment of Buley's residual functional capacity, it is clear that substantial evidence supported the ALJ's conclusion that Buley could perform tasks that require no more than frequent binocular visual acuity or depth perception. The ALJ's position is consistent with the remainder of Rosenblum's opinion and Shefsky's opinion. We thus cannot say that the ALJ erred in assessing Buley's residual functional capacity with respect to her vision.

## B.    The ALJ Did Not Err in Assigning Little Weight to Kim's Opinions.

Buley next argues that the ALJ erred in giving little to no weight to Kim's opinions regarding Buley's physical limitations. Kim opined that Buley had certain exertional limitations—that she should not bend her neck for long periods of time, keep her neck still for more than 20 minutes, or lift ten or more pounds; she should avoid stooping, bending or twisting; and she should use a cane. But the

ALJ was entitled to reject these opinions as inconsistent with the other medical evidence in the record.

Although Kim was a treating physician whose opinions normally would be entitled to substantial weight, *see Lewis*, 125 F.3d at 1440, the ALJ found good cause to give Kim's opinions little or no weight because they contradicted the records from Le, Shefsky, and Kim. Substantial evidence supports the ALJ's conclusion. For example, Le's treatment notes can be interpreted as showing that Buley's neck had a full range of motion and was supple and not stiff, and her lumbar spine had a full range of motion with no tenderness or spasms. Le's treatment notes also reflect that at multiple appointments Buley denied experiencing painful joints, nausea, dizziness, or blurred vision. These mild findings are consistent with Le's conservative course of treatment in which he used only medication to treat Buley's pain, and she reported no side effects. The evidence from Shefsky's examination also contradicts Kim's opinions. Shefksy observed that Buley's neck was supple, she had a full range of motion, her joints were stable and nontender, and she had no trigger points. Although Buley had a mildly antalgic gait, Shefsky observed that she could otherwise walk on her heels and toes without difficulty. Furthermore, Kim's own records indicate that Buley's neck was supple, and her musculoskeletal system was normal. Although Kim opined in the letter that Buley should use a cane, Kim noted in records from the

16

same time period that she had a normal balance, gait, and stance.  Because the medical evidence from Le, Shefsky, and Kim herself supports findings contrary to the extensive limitations Kim identified in her letter, we conclude that the ALJ had good cause to give little weight to Kim's opinions.

In assigning Kim's opinions little weight, the ALJ also observed that Kim said Buley had not received extensive medical treatment because she had no income and could not afford health insurance.  The ALJ noted, however, that Buley had some income:  she continued to work at her tattoo establishment after filing for disability.  To the ALJ, this discrepancy suggested that Kim was relying in part on Buley's subjective reports instead of objective findings.  Buley challenges specifically this aspect of the ALJ's decision.  But because there was evidence that Buley continued to earn some income, which was inconsistent with Kim's statement, the ALJ's decision to afford little to no weight to Kim's opinions, even though she treated Buley, was not erroneous.

## C.    The ALJ Did Not Err in Finding Buley Not Credible.

Finally, Buley challenges the ALJ's decision not to credit her statements about her pain and other symptoms.  The ALJ found that Buley was not credible because her testimony was inconsistent with her treatment records, she was able to work after the alleged onset of disability date, and the ALJ's observations of Buley

17

at the hearing were inconsistent with what she reported.  Substantial evidence supports the ALJ's adverse credibility determination.

When a claimant attempts to establish a disability through her own testimony concerning her pain, we require "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).  If the record shows that the claimant has a medically determinable impairment that could reasonably be expected to produce her symptoms, the ALJ must evaluate the intensity and persistence of the symptoms to determine how they limit the claimant's capacity for work.  20 C.F.R. § 416.929(c)(1).  In assessing such symptoms and their effects, the ALJ must consider: the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication taken to relieve the pain; treatment, other than medication, for relief of the pain; any other measure used to relieve the pain; and any other factors concerning functional limitations and restrictions due to the pain.  *Id.* § 416.929(c)(2)-(3).

If the ALJ determines that the claimant's statements about her symptoms are not credible, the ALJ must "provide[] a detailed factual basis for [the] credibility

18

determination," which must be supported by substantial evidence. *Moore*, 405 F.3d at 1212. The ALJ may "consider[] the claimant's appearance and demeanor during the hearing." *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985). But the ALJ "must not impose his observations in lieu of a consideration of the medical evidence presented." *Id.*

Substantial evidence supports the ALJ's conclusion that Buley's medical records did not support her subjective complaints of pain. Buley claimed that she was unable to work due to her back pain, neck pain, headaches, and vision problems. Although Buley complained to her medical providers about neck and back pain, the providers noted no deficits in strength or sensation. And, as the ALJ noted, Buley's providers followed conservative treatment plans relying only on medication. Buley argues that the ALJ improperly substituted his opinion for that of a physician in describing her treatment, but the ALJ was permitted to consider the type of treatment Buley received in assessing the credibility of her subjective complaints of pain. *See* 20 C.F.R. § 416.929(c)(3)(iv)-(v). Buley further contended that the medication made her nauseous and that she experienced side effects. But the treatment records reflect that the medication effectively treated her pain without side effects.

In making the adverse credibility determination, the ALJ also considered that Buley continued to work after the onset date of her disability. Because

19

substantial evidence supports the ALJ's finding that Buley continued to work despite claiming that her disabling conditions left her unable to work, we cannot say that the ALJ erred in finding her not credible.[6]

The ALJ also found Buley not credible based upon his observations of her at the hearing, noting that she showed no symptoms of pain, was able to read documents (while wearing her corrective lenses), and needed no cane. The ALJ was permitted to consider his observations at Buley's demeanor at the hearing as one of the many factors that called Buley's credibility into question. *See Norris*, 760 F.2d at 1158.

## IV.    CONCLUSION

For the reasons set forth above, we affirm the Commissioner's decision to deny benefits.

**AFFIRMED.**

---

[6] In discussing Buley's work history, the ALJ observed that Buley's tax returns showed in some years Buley paid herself a salary and in other years paid herself a distribution from the company, in lieu of a salary. Buley argues at length why she was permitted to pay herself a distribution in lieu of a salary. But Buley misses the point. In making the adverse credibility determination, the ALJ focused on the fact that Buley had continued to work after claiming to be disabled. Because substantial evidence supported the ALJ's conclusion, the ALJ did not err in making the adverse credibility determination.